UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ESTHER WILSON,

                Plaintiff,

    v.

NANCY A. BERRYHILL,

                Defendant.

Case No. 17-cv-05385-PJH

**MEMORANDUM DECISION AND ORDER THEREON**

Re: Dkt. Nos. 13, 15

      Esther Wilson seeks judicial review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for disability benefits pursuant to 42 U.S.C. § 405(g). Having considered the parties' cross-motions, the pertinent legal authorities, and having reviewed the administrative record, the court hereby remands this case to the Commissioner for further proceedings in accordance with this court's order.

## BACKGROUND

**A.    Personal History**

      On February 21, 2013, Wilson filed an application for a period of disability and disability insurance benefits which gave rise to this appeal. Administrative Record ("A.R.") 56–57. Wilson has a high school education and attended college. A.R. 299, 514. From 1989 to 2000, Wilson worked as a psychiatric technician. A.R. 305. That position involved dispensing medication and assisting doctors with exams. A.R. 306. From 2000 to 2003 she worked in "funeral sales." A.R. 305. Most recently, Wilson

---

[1] Pursuant to Civil Local Rule 7-14, this order may not be cited except as provided by Civil Local Rule 3-4(e).

worked at a temporary agency as an administrative assistant from 2008–2010 or 2011. A.R. 299, 305, 307, 715–16.

Wilson received care for anxiety and panic attacks at Highland Hospital as early as 2008. She complained of increased stress and anxiety and increasing frequency of panic attacks while driving or taking the bus during visits on June 3, 2008, July 17, 2008, and October 16, 2008. A.R. 382–83, 406; see also A.R. 407. She noted that the panic attacks resolved quickly when she stopped or avoided inciting factors. A.R. 407.

She began taking Celexa medication to treat her symptoms sometime prior to November 23, 2008. A.R. 381. (Celexa is the brand name for the drug citalopram, and the names are used interchangeably herein.) In August 2009 and April 2010, Wilson reported improvement and stated that "Celexa has stopped her anxiety/panic attacks." A.R. 373, 378. In April 2012, her primary care physician, Dr. Nick Nelson, noted her anxiety "sounds to be reasonable [sic] well controlled." A.R. 390. However, on October 10, 2012, after a "somewhat stressful period," Wilson reported an increase in panic attacks and her dose of citalopram was increased. A.R. 388–89.

On January 9, 2013, Wilson reported that the increased dose of citalopram made her feel increasingly depressed and suicidal. A.R. 387. She developed hyperirritability and intense sensitivity to noise. Id. She reported that she controlled her symptoms by staying inside most of the day and watching TV. Id. She reported racing thoughts and trouble falling asleep at night. Id. At the request of Dr. Nelson, Wilson was referred to psychiatrist Dr. Gannon, citalopram was discontinued, and Mirtazapine was started. Id. On February 20, 2013, Mirtazapine was discontinued and she was started on Fluoxetine. A.R. 386. On June 19, 2013, Wilson complained of side effects, and as a result Dr. Nelson switched her from Fluoxetine to Sertraline. A.R. 559.

On July 2, 2013, Wilson underwent an internal medicine consultative examination with Jenna Brimmer, M.D. A.R. 506. Wilson reported that her symptoms, including racing heart and panic attacks, worsened in 2008 and that she had a worse memory, thoughts about hurting others (which improved on Zoloft), and a history of hearing voices

1   (which improved on Prozac).  Id.  She reported that the medications she was taking made

2   her feel dizzy and helped her symptoms but made her mind feel "numb."  Id.  Dr. Brimmer

3   noted no significant abnormalities from the physical exam.  A.R. 508.

4        Also on July 2, 2013, Wilson underwent a psychological consultative examination

5   with Amy Loarie, Psy.D.  A.R. 513.  Wilson reported that she required assistance from

6   her daughter with activities of daily living such as doing her hair, cleaning, laundry,

7   grocery shopping, cooking, going to appointments, and managing her money and

8   medication.  Id.  She reported symptoms such as panic attacks, depression, poor noise

9   tolerance, inability to sleep, and problems with memory and concentration.  Id.  She

10  reported that although she attended church on Saturdays with her daughter, she mainly

11  stayed home and watched TV.  Id.  She reported that her symptoms prohibited her from

12  driving, using public transportation, and working.  A.R. 514.  Dr. Loarie's mental status

13  findings included poor immediate memory "as she recalled 1 out of 3 items after 10

14  minutes."  A.R. 515.  Dr. Loarie noted that "[t]he overall clinical presentation, without

15  having conducted formal testing, is that of an individual with average cognitive abilities."

16  Id.  Dr. Loarie diagnosed Wilson with Anxiety Disorder and Personality Disorder with a

17  Global Assessment of Functioning ("GAF") of 60.  A.R. 516.  She found moderate

18  impairment in Wilson's ability to withstand the stress of a routine workday and mild

19  impairments in her abilities to follow complex/detailed instructions, maintain adequate

20  pace and persistence to perform complex tasks, maintain adequate

21  attention/concentration, and adapt to changes, hazards, or stressors in a workplace

22  setting.  Id.  She found no impairment in Wilson's ability to follow simple instructions,

23  maintain adequate pace or persistence to perform one or two step simple repetitive tasks,

24  adapt to change in job routine, and interact appropriately with co-workers, supervisors,

25  and the public on a regular basis.  Id.  She found that Wilson would be able to manage

26  her own funds.  Id.

27       On September 26, 2013, Wilson followed up with Dr. Nelson and reported that the

28  switch to Sertraline made her head feel like it was about to explode and that it caused her

3

to start yelling at her neighbors. A.R. 557–58. As a result, Dr. Nelson discontinued the Sertraline and put Wilson back on citalopram. A.R. 558. Dr. Nelson referred Wilson to a new psychologist, Dr. Bland, "for a solid diagnosis and recommendations regarding therapy." Id.

In January 2014, Wilson saw Dr. Nelson for a follow up. Dr. Nelson reported "She is doing very well. She is having occasional anxiety attacks, which are pretty much exclusively associated with being in a car or bus[.]" A.R. 557. On May 22, 2014, Wilson followed up with Dr. Nelson and reported that her anxiety was still causing her trouble. A.R. 570. Her citalopram was raised to 40mg. A.R. 570–71.

On December 12, 2014, Wilson went to a psychiatric consultation with Dr. Anton Bland. A.R. 567. Wilson complained of feeling depressed and restless more than half the days. Id. She reported feeling less anxious, and her ability to sleep was improved on Gabapentin, but she still felt she needed assistance outside the home. Id. The mental status exam was "generally normal." Id. Dr. Bland diagnosed Wilson with depression and anxiety, likely generalized anxiety disorder with mild depression. A.R. 568. He had no opinion about her level of disability. Id.

On May 5, 2015, Wilson saw Dr. Nelson. A.R. 660. She was feeling "very well." A.R. 660. She had been referred to therapy but had trouble following up due to insurance. Id.

On October 7 & 8, 2015, Wilson underwent a psychological evaluation with evaluating psychologist Dr. Lesleigh Franklin. A.R. 626. Dr. Franklin administered a number of procedures, including Beck Anxiety Inventory (BAI), Beck Depression Inventory (BDI), Clinical Interview, Miller Forensic Assessment of Symptoms (M-FAST), Mini Mental State Examination (MMSE), Repeatable Battery for the Assessment of Neuropsychological Status (RBANS)-Form A, and Trail Making A & B. Id. Wilson's symptoms included depressed mood most of the day, loss of interest, significant weight fluctuation, sleep disturbance, psychomotor retardation, fatigue, feelings of worthlessness and guilt, poor concentration, suicidality, visual hallucinations, problems with memory,

and physiological symptoms associated with anxiety, including those consistent with

panic attacks and agoraphobia. A.R. 630.

Dr. Franklin assessed "marked" impairments in Wilson's abilities to understand,

remember and carry out very short and simple instructions; understand, remember and

carry out detailed instructions; maintain attention for two-hour segments; perform at a

consistent pace without an unreasonable number and length of rest periods; get along

and work with others; interact appropriately with the general public; and accept

instructions and respond appropriately to criticism from supervisors. A.R. 633.

Dr. Franklin assessed "extreme" impairments in Wilson's abilities to respond

appropriately to changes in a routine work setting and deal with normal work stressors

and to complete a normal workday and workweek without interruptions from

psychologically based symptoms. Id. She assessed "mild" impairment in Wilson's ability

to maintain regular attendance and be punctual within customary, usually-strict

tolerances. Id.

On October 13, 2015, Dr. Nelson filled out a Mental Impairment Questionnaire.

A.R. 634. He diagnosed Wilson with panic disorder and assed her GAF at 60. Id. He

noted that she was not a malingerer. Id. Dr. Nelson stated in treatment notes from that

visit that Wilson's anxiety was "stable." A.R. 671. He assessed "extreme" impairments in

her abilities to deal with normal work stress and complete a normal workday and

workweek without interruptions from psychologically based symptoms. A.R. 636. He

assessed "marked" impairments in her abilities to maintain attention for two-hour

segments; maintain regular attendance and be punctual within customary, usually-strict

tolerances; perform at a consistent pace without an unreasonable number and length of

rest periods; sustain an ordinary routine without special supervision; accept instructions

and respond appropriately to criticism from supervisors; work with or near others without

being unduly distracted or distracting them; interact appropriately with coworkers; interact

appropriately with the general public; respond appropriately to changes in a routine work

setting; maintain social functioning; and concentrate, be persistent, and pace. A.R. 636–

37. He assessed "moderate" impairment in her ability to undertake activities of daily living. A.R. 637. He assessed "mild" impairment in her ability to understand, remember and carry out simple instructions. A.R. 636. He assessed "no" impairment in her ability to adhere to basic standards of neatness and cleanliness. Id. He did not indicate any impairment in her ability to make simple work-related decisions. Id. He indicated that she would have four or more episodes of decompensation in a 12-month period. A.R. 637. Finally, Dr. Nelson indicated that Wilson's impairments would interfere with her concentration or pace of work 30% of the time, and that they would cause her to be absent from work more than four days per month. Id.

In March 2016, Wilson went to the Multilingual Counseling Center for therapy. A.R. 642. The records from that visit report that she met the diagnostic criteria for panic disorder. Id. The mental status exam noted a sad mood/affect. A.R. 646. Wilson complained of sensitivity to noise and described a recent panic attack due to her daughter not being able to take care of her as she normally had been doing. A.R. 649–51. The record reports that Wilson was "unable to work and has severely limited ability to complete activities of daily functioning due to her symptoms." A.R. 642.

On June 9, 2016, Wilson was evaluated at Pathways to Wellness. The assessment report noted marked impairments in maintaining, concentration, and persistence of place and episodes of decomposition and increase of symptoms of extended duration. A.R. 707.

**B.    Procedural History**

On February 21, 2013, Wilson filed her initial application for Social Security disability insurance. A.R. 56–57. In it, Wilson alleged a disability onset date of September 30, 2011. A.R. 58. The Commissioner denied Wilson's application both initially and again upon reconsideration on August 19, 2013 and March 19, 2014, respectively. A.R. 120, 125. On May 13, 2014, Wilson requested a hearing before an administrative law judge ("ALJ") which took place on November 19, 2015. A.R. 155–56, 38. Richard Gross, Ph.D., a psychological expert, testified at this proceeding. A.R. 38.

1  Due to technical difficulties the hearing ran over time, so a supplemental hearing took

2  place on May 26, 2016.  A.R. 710.  Wilson testified at that hearing.  See A.R. 715.

3       On July 13, 2016, the ALJ issued a decision finding Wilson not disabled under the

4  Social Security Act ("the Act").  A.R. 17.  The ALJ found that Wilson's impairment did not

5  meet or medically equal an impairment listed in 20 C.F.R. part 404, subpart P,

6  appendix 1.  A.R. 23.  In addition, the ALJ found that although Wilson was unable to

7  perform her past relevant work, she was able to perform other work existing in significant

8  numbers in the national economy, including performance as a laundry worker, warehouse

9  worker, and kitchen helper.  A.R. 30.  When Wilson's subsequent request for review was

10  denied by the Appeals Council on July 21, 2017, the ALJ's decision became the

11  Commissioner's final decision.

**STATUTORY AND REGULATORY FRAMEWORK**

13       The Social Security Act provides for the payment of disability insurance benefits to

14  people who have contributed to the social security system and who suffer from a physical

15  or mental disability.  See 42 U.S.C. § 423(a)(1).  To evaluate whether a claimant is

16  disabled within the meaning of the Act, the ALJ is required to use a five-step sequential

17  analysis.  See 20 C.F.R. § 416.920(a).  The ALJ may terminate the analysis at any step if

18  it determines that the claimant is or is not disabled.  Pitzer v. Sullivan, 908 F.2d 502, 504

19  (9th Cir. 1990).

20       At step one, the ALJ determines whether the claimant is engaging in any

21  "substantial gainful activity," which would automatically preclude the claimant receiving

22  disability benefits.  20 C.F.R. §§ 416.920(a)(4)(i) & (b).  If not, at step two, the ALJ

23  considers whether the claimant suffers from a severe impairment which "significantly

24  limits [her] physical or mental ability to do basic work activities."  20 C.F.R.

25  §§ 416.920(a)(4)(ii) & (c).

26       At the third step, the ALJ is required to compare the claimant's impairment(s) to a

27  listing of impairments provided in an appendix to the regulations.  20 C.F.R.

28  § 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments meets or

equals the severity of any medical condition contained in the listing, the claimant is presumed disabled and should be awarded benefits. Id.; 20 C.F.R. § 416.920(d).

If the claimant's condition does not meet or equal a listing, at step four the ALJ considers whether the claimant has sufficient residual functional capacity ("RFC") to perform her past work despite the limitations caused by the impairments. 20 C.F.R. §§ 416.920(a)(4)(iv) & (e)–(f). An individual's RFC is what he can still do in a workplace setting despite his physical and mental limitations. 20 C.F.R. § 416.945. In determining the RFC, the ALJ must consider all of the claimant's impairments, including those that are not severe, taking into account all relevant medical and other evidence. 20 C.F.R. §§ 416.920(e), 416.945. If the claimant cannot perform his past work, the Commissioner is required to determine, at step five, whether the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration the claimant's RFC, age, education, and work experience. See 20 C.F.R. §§ 404.920(a)(4)(v) & (g).

In steps one through four, the claimant has the burden to demonstrate a severe impairment and an inability to engage in his previous occupation. Andrews v. Shalala, 53 F.3d 1035, 1040 (9th Cir. 1995). If the analysis proceeds at step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other work. Id.

**ALJ'S FINDINGS**

On July 13, 2016, the ALJ applied the sequential analysis and found that Wilson was not disabled, concluding that she could perform jobs within the national economy. A.R. 20–30.

**A.     The ALJ's Sequential Analysis**

At step one, the ALJ determined Wilson had not engaged in "substantial gainful activity" since her onset date of September 30, 2011. A.R. 22.

At step two, the ALJ found Wilson suffered from severe impairments of depressive disorder, anxiety disorder, and panic disorder. Id. The ALJ also found that Wilson's hypertension, dermatitis, chest pain of unknown etiology, allergies, Achilles tendonitis,

and knee pain were non-severe impairments and that Wilson did not provide evidence that these impairments would result in a significant limitation in basic work-related activities.  A.R. 22–23.

At step three, the ALJ concluded that the impairments failed to meet the criteria or severity of any section of the listing of impairments in 20 C.F.R. part 404, subpart P, appendix 1.  A.R. 23–24.  The ALJ therefore found that disability could not be established on the medical facts alone.

Having found that Wilson did not suffer from a listed impairment, the ALJ determined Wilson's RFC.  A.R. 24–29.  The ALJ applied a two-step process that considered all symptoms regardless of severity.  First, the ALJ determined whether there was an underlying medically-determinable physical or mental impairment that could reasonably be expected to produce Wilson's pain or other symptoms.  The ALJ concluded that Wilson's medically-determinable impairments could reasonably be expected to cause the alleged symptoms.  A.R. 27.  Second, the ALJ evaluated the intensity, persistence, and limiting effects of Wilson's symptoms to determine the extent to which they limited her functioning.  The ALJ concluded that Wilson's testimony about the intensity, persistence and limiting effects of the symptoms was not entirely consistent with medical evidence and other evidence in the record.  A.R. 27–28.  Where Wilson's reported symptoms did not match the objective medical evidence, the ALJ made a credibility determination based on the entire medical record.

> The claimant alleged that she suffers from debilitating panic attacks and depression but the record reveals that the claimant improved with treatment and providers consistently noted normal mental status findings except for a depressed mood.  A provider described the claimant as having a good sense of humor who is well educated, intelligent, and self-reflective who is motivated to participate in treatment and reduce her symptoms. (Exhibit 20F/06).  The claimant was able to engage in relatively wide activities of daily living despite her symptoms including attending school.

A.R. 27.

The ALJ afforded limited weight to Dr. Franklin's and Dr. Nelson's opinions.  A.R.

9

28. Accordingly, the ALJ found Wilson's RFC allowed her to perform work at all exertional levels, subject to non-exertional limitations. A.R. 24 ("The claimant is able to understand, remember, and carry out simple instructions. The claimant is precluded from detailed instructions.").

At step four of the sequential analysis, the ALJ determined that these limitations prevented Wilson from performing any of her past relevant work. A.R. 29. Proceeding to step five, based on the vocational expert's testimony, the ALJ determined that jobs existed in significant numbers in the national economy that Wilson could perform. A.R. 29–30. Specifically, Wilson's RFC did not prevent her from working as a laundry worker, warehouse worker, or kitchen helper as described in the Dictionary of Occupational Titles. Id. The ALJ therefore determined that Wilson was not disabled and not eligible for disability benefits under the Social Security Act. A.R. 30.

## B.     The ALJ's Weighing of the Medical Opinions and Testimony

The ALJ considered and weighed the testimony and opinions of several medical professionals. Most prominently, the ALJ considered opinions authored by Doctors Nelson, Franklin, Loarie, and Gross.

### 1.     Dr. Nelson

Dr. Nelson had been Wilson's primary care provider since April 2012. The record contains several notes from his course of treatment. Dr. Nelson also filled out a Mental Impairment Questionnaire on October 13, 2015. A.R. 634. In it, Dr. Nelson opined that Wilson had panic disorder and a GAF of 60. Dr. Nelson assessed marked and extreme impairments in many of Wilson's abilities. A.R. 636–37.

On December 3, 2015, Dr. Nelson wrote a letter "To Whom It May Concern" stating that he had actively managed Wilson's psychiatric disorder since April 2012. A.R. 639. He wrote that he has observed Wilson's "struggle with anxiety, ranging from periods of reasonably well-compensated mental health to periods during which she struggled with delusional and violent thoughts and crippling anxiety attacks[.]" Id. He opined that "[a]nxiety remains a severely limiting factor in her life and one which prevents her from

carrying on a normal work or social life." Id.

The ALJ gave Dr. Nelson's opinion "very limited weight" because his opinion was in a "poorly supported check the box format with no cites to objective evidence to support the opinion." A.R. 28. The ALJ also found that the opinion was inconsistent with the assessed GAF score of 60, other medical opinions, the normal mental status findings noted by providers, Wilson's activities of daily living, and her ability to manage her own funds. Id.

### 2. Dr. Franklin

Dr. Franklin administered a psychological evaluation of Wilson on October 7 & 8, 2015. A.R. 626. Dr. Franklin assessed marked and extreme impairment in many of Wilson's abilities. A.R. 633.

The ALJ gave Dr. Franklin's opinion "very limited weight" because her opinions were "not consistent with the claimant's prior job in the medical field" because that job would have "required high levels of cognition." A.R. 28. The ALJ also gave the opinion limited weight because it was not consistent with normal mental status findings noted by providers, the normal mental status and cognitive findings by the consultative psychologist, and Wilson's activities of daily living, including going to school and studying for long stretches. Id. The ALJ found that Dr. Franklin's opinion was inconsistent with, among others, the medical expert Dr. Gross's opinion and consultative examiner Dr. Loarie's opinion. Id.

### 3. Dr. Loarie

Amy Loarie, Psy.D. conducted a psychological consultative examination of Wilson on July 2, 2013. A.R. 513. Dr. Loarie noted that "The overall clinical presentation, without having conducted formal testing, is that of an individual with average cognitive abilities." A.R. 515. She opined that Wilson had Anxiety Disorder and Personality Disorder with a GAF of 60. A.R. 516. Dr. Loarie found mostly mild impairments in Wilson's abilities. Id.

The ALJ gave significant weight to the opinion of Dr. Loarie because it is "well-

1  supported, consistent with the treating provider's mental status findings, the consultative

2  psychologist's findings, and the claimant's activities of daily living." A.R. 28.

3      **4.   Dr. Gross**

4      On November 19, 2015, Medical Expert Dr. Richard Gross testified that Wilson's

5  impairments included depressive disorder, anxiety disorder, and panic disorder. A.R. 41.

6  He testified that Wilson was mildly impaired in the area of activities of daily living and in

7  the area of social functioning. Dr. Gross testified that there was a discrepancy between

8  the consultative examination by Dr. Amy Loarie and the examination by Dr. Franklin

9  concerning Wilson's abilities to maintain attention and concentration. A.R. 44. He

10 compared the normal mental status examination from Dr. Loarie's exam to Wilson's

11 performance on the memory index of the RBANS administered by Dr. Franklin. Id. He

12 explained that he would tend to "go more along with [the normal mental status exam]

13 insofar as cognition is concerned" based on its consistency with other evidence. Id.

14 Dr. Gross testified that, other than Dr. Franklin's report, the record reflected that Wilson's

15 attention and concentration appear to be intact. A.R. 45.

16     The ALJ gave "very significant weight" to the medical expert's opinion in part

17 because his opinion was "well-supported, based on the full record, and consistent with

18 the claimant's improvement with treatment, the mental status findings, and the claimant's

19 activities of daily living." A.R. 28. The ALJ found that Dr. Gross's opinion was consistent

20 with Dr. Loarie's opinion. Id.

21                                                 **DISCUSSION**

22 **A.    Standard of Review**

23     This court has jurisdiction to review final decisions of the Commissioner pursuant

24 to 42 U.S.C. § 405(g). See 42 U.S.C. § 405(c)(9) ("Decisions of the Commissioner of

25 Social Security under this subsection shall be reviewable by commencing a civil action in

26 the United States district court as provided in subsection (g)"). The ALJ's decision must

27 be affirmed if the ALJ's findings are "supported by substantial evidence and if the [ALJ]

28 applied the correct legal standards." Holohan v. Massanari, 246 F.3d 1195, 1201 (9th

Cir. 2001); see 42 U.S.C. § 405(g) ("findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). "Substantial evidence means more than a scintilla, but less than a preponderance." Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotation marks and citations omitted); Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005); Smolen, 80 F.3d at 1279. If the evidence is subject to more than one rational interpretation, the court must uphold the ALJ's findings if they are "supported by inferences reasonably drawn from the record." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); see Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005). Yet the reviewing court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017).

"The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered." Id. at 1150 (internal quotation marks omitted). Although the ALJ can and must weigh conflicting evidence, "he cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result." Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision. Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1991). Harmless error is an error by the trier of fact which does not justify the reversal or modification of the lower court's ruling. See id.

**B.      Issues**

Wilson seeks reversal of the ALJ's denial of Social Security disability benefits, arguing as follows:

1.    The ALJ erred in according inadequate weight to Dr. Nelson's opinion.

2.    The ALJ erred in according inadequate weight to Dr. Franklin's opinion.

3.    The ALJ failed to provide any reasons for her rejection of treatment records from Pathways to Wellness and Multilingual Counseling Center.

4.    The ALJ's RFC determination was not based on substantial evidence.

5.    The ALJ erred in failing to find that Wilson met listings 12.04 and 12.06 to qualify as disabled for the purposes of the Social Security Act.

6.    The ALJ erred in evaluating Wilson's credibility as a witness.

7.    The District Court should remand for benefits rather than further administrative proceedings.

**C.    Analysis**

**1.    Whether the ALJ Erroneously Accorded Doctors' Opinions Improper Weight**

Ninth Circuit case law distinguishes the weight to be accorded to the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Id.

"When presented with conflicting medical opinions, the ALJ must determine credibility and resolve the conflict." Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004). "To reject the uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." Revels, 874 F.3d at 654. "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Id.; Lester, 81 F.3d at 830–31. "The ALJ can meet this burden by setting out a detailed and

thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Revels, 874 F.3d at 654; Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600–01 (9th Cir. 1999). "In the absence of record evidence to support it, the nonexamining medical advisor's testimony does not by itself constitute substantial evidence that warrants a rejection of either the treating doctor's or the examining psychologist's opinion." Lester, 81 F.3d at 832.

"When confronted with conflicting medical opinions, an ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). For example, if a treating doctor's "reports and assessments . . . contain no objective evidence to support his diagnoses," the ALJ need not accept the opinion. Id.

### a. Dr. Nelson

Dr. Nelson is Wilson's treating physician whose opinion was contradicted by Dr. Loarie and Dr. Gross. Therefore, the ALJ was required to set forth specific and legitimate reasons based upon substantial evidence to discount Dr. Nelson's opinion. Wilson does not argue otherwise. See Dkt. 13 at 14, 16; Dkt. 19 at 2.

The ALJ gave "very limited weight" to the opinion of treating doctor Dr. Nelson who opined that Wilson "would have marked to extreme limitations in most work related activities." A.R. 28 (citing Ex. 18F).

Wilson argues that the ALJ discounted Dr. Nelson's opinion for five improper reasons: (1) the ALJ illegitimately disregarded Dr. Nelson's Mental Impairment Questionnaire; (2) the ALJ unreasonably characterized Wilson's activities of daily living; (3) the ALJ failed to discuss the weight given to the GAF score and explain its relevance; (4) the ALJ failed to explain the relationship between mental status findings and Wilson's ability to do work related-activities; and (5) the ALJ failed to explain the relationship between managing one's own funds and work-related activities.

First, the ALJ reasoned that Dr. Nelson's opinion was in a poorly-supported checkbox format with no cites to objective evidence to support the opinion. It is true that

Dr. Nelson's October 13, 2015 Mental Impairment Questionnaire is largely in checkbox format, and it does not include cites to objective evidence. Wilson points to other treatment notes from Dr. Nelson in the record to support the October 2015 opinion, but even those largely lack objective evidence supporting Dr. Nelson's October 2015 opinions. For example, Dr. Nelson's record observations include that Wilson "is a pleasant woman with a history of anxiety and depression" (A.R. 386), and a number of visitation notes mention anxiety or panic attacks but nowhere near levels of marked impairment (A.R. 388 ("has also been feeling a little bit more anxious than usual" and "says she is having more panic attacks than she normally does"), 390 (anxiety "sounds to be reasonably well controlled"), 558 ("Patient is a delightful 56-year-old woman with a history of a psychiatric disease whose exact character is not entirely clear," a certain pharmaceutical reaction was bad, "and in general things are going okay")). The most severe treatment note described negative reactions to a medication that were largely alleviated by modifying the dosage. A.R. 387. At that same visit, Wilson reported that she "overall characterize[d]" her symptoms as "anxiety," although she felt enraged and manic, but reported "pretty good" energy levels. Id. Dr. Nelson's December 3, 2015 letter did not reflect any new objective observations or evidence. See A.R. 639.

This is a legitimate reason to accord Dr. Nelson's opinion less weight. If a treating doctor's "reports and assessments . . . contain no objective evidence to support his diagnoses," the opinion need not be accepted. Tonapetyan, 242 F.3d at 1149. "An ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings." Batson, 359 F.3d at 1195 (citation omitted). Dr. Nelson's checklist opinion was brief and conclusory, and it was not supported by objective evidence on its face. An examination of Dr. Nelson's treating record does not change that assessment.

Second, the ALJ reasoned that Wilson's school attendance evidences activities of daily living that contradicted Dr. Nelson's opinion. Wilson argues that the record correctly reflects that she had been attending school in April and June of 2012, but that further

development of the record would have shown that Wilson "was not able to complete the classes she had been taking" and even so, school attendance would not be inconsistent with Dr. Nelson's opinion that Wilson had "only moderate impairments in activities of daily living." Dkt. 13 at 17; Dkt. 19 at 4–5; see also A.R. 637. Wilson also argues that the record does not support the ALJ's finding that she was capable of studying for long stretches. Dkt. 19 at 7. Although the record is silent as to Wilson's performance in the classes she took, it supports the finding that she took classes for at least two semesters in 2012 and, during that time, studied for long stretches. A.R. 389 (April 2012, finishing a semester at school), 414 (June 2012, reporting pain after "sitting at a desk for 6 hours studying"), 612 (June 2012, taking summer school).

This is a legitimate reason to accord Dr. Nelson's opinion less weight. The objective record is clear that Wilson was taking classes over the course of at least two semesters and reported that, during the course of those studies, she at least once sat at a desk for six hours to study. This evidence is relevant to Wilson's activities of daily living and her mental acuity and conflicts with Dr. Nelson's opinion.

Third, the ALJ gave limited weight to Dr. Nelson's opinion in part because it was "not consistent with his assessed GAF score of 60[.]" A.R. 28. Wilson argues that the ALJ failed to consider and weigh the GAF score as required by 20 C.F.R. § 404.1527(c) and SSR 06-03p, and that the GAF score without an explanation of its context is not a legitimate basis to set aside a treating doctor's opinion. Dkt. 13 at 18; Dkt. 19 at 5. Although the GAF "does not have a direct correlation to the severity requirements in [the Commission's] mental disorders listings" (65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000); see McFarland v. Astrue, 288 Fed. App'x. 357, 359 (9th Cir. 2008)), it is permissible for an ALJ to consider GAF level as evidence that a claimant's impairments are not as severe as alleged (see Phillips v. Colvin, 61 F. Supp. 3d 925 (N.D. Cal 2014)). Here, the ALJ considered the GAF score only with respect to the internal consistency of Dr. Nelson's opinion. The ALJ did not use the GAF score to determine Wilson's disability severity. Rather, the ALJ compared Dr. Nelson's checklist—which indicated that Wilson

suffered "marked" or "extreme" impairment in 14 categories, "moderate" impairment in one category, no impairment in one category, and did not assess any impairment in Wilson's ability to "make simple work-related decisions"—with his assessed GAF score of 60, which indicates moderate functional limitations, bordering on "mild" symptoms.[2] A.R. 636–37.

This is a legitimate reason to accord Dr. Nelson's opinion less weight. The ALJ reasoned that she would accord Dr. Nelson's opinion "limited weight" in light of its internal inconsistency. The ALJ used the GAF score for the permissible purpose of evaluating credibility, not to determine Wilson's actual functional limitations to determine her disability.

Fourth, the ALJ gave limited weight to Dr. Nelson's opinion in part because it was not consistent with the normal mental status findings noted by providers. Wilson argues that the ALJ should not have used mental status examinations to determine her ability to do work-related activities and that "brief periods of improvement with medication do not undermine Dr. Nelson's opinion." Dkt. 19 at 2–3; see also Dkt. 13 at 18. But the ALJ, considering the record as a whole, reasoned that numerous mental status findings— including some made by Dr. Nelson—were inconsistent with Dr. Nelson's ultimate opinion, and accordingly she gave limited weight to Dr. Nelson's ultimate opinion. For example, Dr. Nelson opined in October 2015 that Wilson was markedly limited in her ability to maintain attention for two-hour segments, work with or near others without being unduly distracted or distracting them, and interact appropriately with the general public. But the record also contains evaluative material suggesting that Wilson had a normal thought process, average intelligence, cooperative behavior, and an ability to concentrate on and answer questions. E.g., A.R. 386, 515, 557–59, 567, 645–47, 671.

This is a legitimate reason to accord Dr. Nelson's opinion less weight. The ALJ

---

[2] A GAF of 61 to 70 would indicate "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. rev. 2000).

identified specific, objective clinical evidence that was inconsistent with Dr. Nelson's opinion. The conflicting evidence undermined Dr. Nelson's credibility.

Fifth, the ALJ gave limited weight to Dr. Nelson's opinion because it was internally inconsistent because he opined that Wilson could manage her own funds. The ALJ did not provide any further reasoning on the point, and Wilson argues that Dr. Nelson was required by regulation to presume Wilson was able to manage her own funds absent certain extreme situations, like a 30-day coma. Dkt. 19 at 5–6.

The court does not opine on whether this is a legitimate reason to accord Dr. Nelson's opinion less weight. Even if it were not a legitimate consideration, any potential error would be harmless, because as explained immediately above, the ALJ identified other sufficient reasons to discount Dr. Nelson's opinion.

Overall, the ALJ gave specific and legitimate reasons to discount Dr. Nelson's October 2015 opinion about the degree of Wilson's impairment. Taken as a whole, the ALJ made her credibility determination based on specific, legitimate reasons based on substantial evidence. In particular, the ALJ reasonably determined that that Dr. Nelson's checklist opinion was conclusory, brief, and unsupported by objective evidence; Wilson's school attendance constituted evidence of her daily living activities and mental acuity during 2012; and Dr. Nelson's assessed GAF score and other providers' mental status findings conflicted with Dr. Nelson's opinions.

### b.    Dr. Franklin

The ALJ afforded "very limited weight to the opinion of Dr. Franklin" because the results of his cognitive testing were inconsistent with "the claimant's prior job in the medical field, which would have required high levels of cognition, the normal mental status findings noted by providers, the normal mental status and cognitive findings noted by the consultative psychologist, and her activities of daily living, including going to school and studying for long stretches." A.R. 28.

Wilson argues that the inconsistencies the ALJ identified were neither specific nor legitimate. Dkt. 13 at 19. Wilson argues that the ALJ discounted Dr. Franklin's opinion

for three improper reasons: (1) the ALJ illegitimately considered prior work experience; (2) Dr. Franklin's mental status testing is more authoritative than other mental status examinations in the record, and one other mental status exam in the record is consistent with Dr. Franklin's opinion; and (3) conflicting opinions from non-examining consultants cannot outweigh Dr. Franklin's opinion.

First, Wilson argues that considering her prior job as a psychiatric technician improperly takes into consideration employment held more than 15 years before the date of the hearing, and it fails to take into account her functional decline as a result of her impairments. Even according to the ALJ's assessed RFC, Wilson could not return to that work. The Commissioner argues without citation that the work experience was relevant to determine her "base cognitive level." Dkt. 15 at 8 n.3.

Work experience older than 15 years is presumptively not relevant to determining a claimant's capacity. See 20 C.F.R. §§ 404.1565 & 416.965 ("The 15-year guide is intended to insure that remote work experience is not currently applied."); see also SSR 82-62 ("work performed 15 years or more prior to the time of adjudication of the claim . . . is ordinarily not considered relevant."). The Commissioner does not contest that Wilson's psychiatric technician work is more than 15 years old. Dkt. 15 at 8 n.3. Moreover, the ALJ's opinion fails to support a finding that Wilson's prior work in the medical field is relevant to assessing the credibility of Dr. Franklin's opinion. Although the ALJ indicated that Wilson once worked in a dual diagnosis alcohol and drug treatment program at a hospital (A.R. 25), the ALJ did not explain that position's responsibilities or how she determined it "required high levels of cognition" (A.R. 28).[3] Additionally, the ALJ specifically noted that Wilson "retired early" from that job, and that Wilson later quit

---

[3] Although the ALJ did not address the issue in the decision, the record would likely support a finding that Wilson's prior job required mental acuity. For example, Wilson's description of the position states that it required her to "dispense medication" and "assist[] doctors with exams." A.R. 306, 716. It also explains that she was required to use "machines tools or equipment," "use technical knowledge or skills," and "complete reports or preform duties of that specific nature." A.R. 306. She did that work for eight hours a day. Id.

working entirely due to her worsening mental health. A.R. 25. In sum, the ALJ cited what the Commissioner does not contest is a presumptively-irrelevant prior job, did not describe the responsibilities of that job, noted that Wilson retired early from that job and ultimately left the workforce due to her worsening condition, and then concluded that the job rebuts Dr. Franklin's recent testing concerning Wilson's mental acuity.

With respect to Wilson's job as a psychiatric technician, the ALJ made her determination to afford it more weight than Dr. Franklin's testing based on specific reasons, but the reasons were not legitimate and they were not based on substantial evidence. Wilson's prior employment cannot be used to discount Dr. Franklin's testing without an explanation of the mental acuity that the job required, some analysis tending to show that Wilson demonstrating that acuity during performance of the job, and an explanation as to why a position held so long ago is relevant to Wilson's mental acuity today.

Second, Wilson argues that Dr. Franklin's formal RBANS testing is distinct from the mental status examinations performed by other providers. Wilson appears to argue both that Dr. Franklin's RBANS testing deserves more weight than other evidence in the record about mental status because it is a uniquely-probative test; and that nothing in the record actually conflicts with the RBANS testing because no opinion challenges how the RBANS test was administered (and the Pathways to Wellness records actually include a consistent mental status exam). Regarding the first argument, Wilson is correct that formal testing conducted by an examining doctor is accorded controlling weight absent conflicting evidence in the record. But if a discrepancy exists between the opinions of different physicians, the ALJ may set forth specific and legitimate reasons to discount an opinion. The ALJ could accord Dr. Franklin's opinions the appropriate weight—even by discounting them—so long as she set forth evidence and reasons for doing so. Regarding the second argument, the ALJ may reject Dr. Franklin's opinions that are based on the RBANS test without citing a conflicting RBANS test or evidence in the record specifically challenging how Dr. Franklin's RBANS test was administered. As with

1   any other opinion, the ALJ may accord it less weight based upon substantial evidence,

2   including "clinical evidence" that the ALJ finds to be conflicting. Morgan, 169 F.3d at

3   600–01. Put differently, the ALJ must identify evidence conflicting with Dr. Franklin's

4   conclusions; she need not identify evidence directly challenging each of the bases

5   supporting Dr. Franklin's conclusions or the particular tests he conducted. As such,

6   Dr. Franklin's RBANS testing does not definitively cabin the ALJ's discretion to discount

7   its persuasive value so long as the ALJ identifies reasonable, competing evidence. The

8   same is true if some evidence in the record tends to conflict with Dr. Franklin's

9   conclusions and some tends to support them. Here, the ALJ identified conflicting

10  opinions and clinical evidence, which is sufficient to defeat both of Wilson's arguments

11  with respect to the RBANS testing.

12      Third, Wilson argues that non-examining witness "Dr. Gross's opinion cannot by

13  itself justify the rejection of the opinion of Dr. Franklin, an examining psychologist. Thus,

14  the ALJ erred in relying on the opinion of a non-examining physician as substantial

15  evidence for rejecting the opinion of Dr. Franklin." Dkt. 13 at 21. It is true that a non-

16  examining witness's opinion cannot alone warrant rejecting a conflicting examining

17  medical advisor's opinion absent supporting record evidence. Lester, 81 F.3d at 832. If

18  she accepts the non-examining witness's opinion, the ALJ must set forth specific and

19  legitimate reasons based upon substantial evidence, and she may accomplish that by

20  "setting out a detailed and thorough summary of the facts and conflicting clinical

21  evidence, stating his interpretation thereof, and making findings." Morgan, 169 F.3d at

22  600–01. Here, the ALJ did not rely on Dr. Gross's opinion alone to discount

23  Dr. Franklin's opinion. The ALJ set out a summary of the facts and conflicting clinical

24  evidence and explained her interpretation thereof. The ALJ found that Dr. Franklin's

25  opinion was in conflict with clinical evidence in the record, including normal mental status

26  findings noted by providers, normal mental status and cognitive findings noted by the

27  consultative psychologists, and Wilson's activities of daily living, including her attendance

28  at school.

The ultimate question with respect to Dr. Franklin's opinion is whether the ALJ gave sufficient reasons and cited sufficient evidence to discount the opinion.  Taken as a whole, the ALJ made her credibility determination based on specific, legitimate reasons based on substantial evidence.  Although the ALJ's consideration of Wilson's prior work experience as a psychiatric technician was insufficiently explained for this court to determine whether it constituted a legitimate reason, the ALJ reasonably determined that Dr. Franklin's opinion was in conflict with examining psychologist Dr. Loarie's finding that Wilson had intact memory, an ability to attend and concentrate on questions throughout the evaluation, coherent thoughts, and average cognitive abilities (A.R. 515); Alameda County Department of Behavioral Health records finding that Wilson was intelligent and self-reflective with fair concentration and fair memory (A.R. 645–47); consulting psychiatrist Dr. Bland's assessment that Wilson had average intelligence and normal cognition (A.R. 567); and other, clinical record evidence (e.g., A.R. 386, 557–59, 671). As a result, the ALJ found the opinion of Dr. Gross more in line with the record evidence, and the ALJ credited Dr. Gross's opinion rather than Dr. Franklin's conflicting opinion.

The ALJ's consideration of Wilson's prior work as a psychiatric technician, if error, was harmless, because the clinical evidence and competing opinions the ALJ identified provided a sufficient basis to determine the issue.

**2.      Whether the ALJ Treated Records from Pathways to Wellness and Multilingual Counseling Center Erroneously**

The Federal Regulations provide that "Regardless of its source, [the Commission] will evaluate every medical opinion we receive." 20 C.F.R. §§ 404.1527(c) & 416.927(c). "Evaluating" such opinions requires the ALJ to "consider" six enumerated "factors in deciding the weight we give to any medical opinion." Id. Even when presented with "[o]pinions from medical sources who are not acceptable medical sources and from nonmedical sources," the ALJ "will consider these opinions using the same factors," although "not every factor for weighing opinion evidence will apply in every case" depending on "the particular facts in each case." 20 C.F.R. §§ 404.1527(f)(1) &

416.927(f)(1). The regulations explain that "after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an acceptable medical source or from a nonmedical source may outweigh the medical opinion of an acceptable medical source, including the medical opinion of a treating source." Id. When considering such nonmedical opinions, "[t]he adjudicator generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R. §§ 404.1527(f)(2) & 416.927(f)(2) (emphasis added). However, "when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision in hearing cases and in the notice of determination . . . if the determination is less than fully favorable." Id. (emphasis added).

Wilson argues that clinical records submitted from Pathways to Wellness and the Multilingual Counseling Center include medical opinions regarding functional limitations that the ALJ was compelled to consider. See A.R. 699–709, 642–51. Wilson argues that the ALJ did not address those records or assign any weight to the opinions therein. Rather, she argues, the ALJ broadly cited those records and characterized them as "not reveal[ing] any objective worsening in the claimant's condition." A.R. 26.

The Commissioner argues that those reports do not constitute medical source opinions to be weighed pursuant to the factors set out in 20 C.F.R. §§ 404.1527 & 416.927 because they were completed as intake assessments to determine a proper course of treatment, not a developed evaluation of Wilson's work-related mental functioning. See A.R. 642–51, 704–09. Still, the Commissioner recognizes that the reports contain conclusions from mental status examinations, including diagnoses of particular disorders. Dkt. 15 at 10–11. The Commissioner also argues that the records mostly repeat Wilson's own allegations of mental dysfunction and as such have little or no probative value.

24

As an initial matter, the classification of the reports as medical opinions or nonmedical opinions is not dispositive.  The ALJ gave portions of the Pathways to Wellness and Multilingual Counseling Center reports greater weight than the conflicting opinions from treating physician Dr. Nelson and examining physician Dr. Franklin.  A.R. 26.  For example, the ALJ reasoned that "[r]ecords from 2015-2016 do not reveal any objective worsening in the claimant's condition" based in part on these records.  Id.  The ALJ relied on the Multilingual Counseling Center report for the conclusion that "Providers noted normal mental status examinations except for a sad mood and affect."  Id.  Because the ALJ relied on opinions from these sources and gave them greater weight than the opinions of treating sources, the ALJ was required to explain the reasons for the weight she gave those reports even if they were nonmedical opinions.  20 C.F.R. §§ 404.1527(f)(2) & 416.927(f)(2).  The ALJ committed error by not doing so.

The court may not reverse an ALJ's decision on account of an error that is harmless.  Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012).  "The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."  Id.

Wilson points to opinions in those reports that tend to conflict with the ALJ's explanation of the records.  For example, the Multilingual Counseling Center report includes a statement that Wilson "is unable to work and has severely limited ability to complete activities of daily functioning due to her symptoms" (A.R. 642), and the Pathways to Wellness record opines that Wilson has a "marked" degree of limitation based on difficulties in maintaining concentration and episodes of decomposition of extended duration (A.R. 707).

Because Wilson identifies what may be internal conflicts within the reports, the ALJ's failure to provide well-reasoned explanations of the weight afforded the records is reversible error.  A more thoroughly-reasoned explanation would elucidate the ALJ's reasoning with respect to weighing these records, as the regulations require.  For example, the ALJ might determine that the records are entirely credible and accept the

conclusion that Wilson is unable to work at all due to her symptoms. Or the ALJ might determine that the records are internally inconsistent and therefore not reliable, which, like Dr. Nelson's opinion, would limit the weight the ALJ affords them. Or the ALJ might reason that the portions of the records reflecting objective clinical observations are credible, different portions of the records repeating Wilson's self-reported conclusions are not credible, and still other portions reflecting diagnosis conclusions are either credible or not. On the current record, this court could only speculate about the ALJ's credibility analysis, which is why the regulations require the analysis to be articulated.

As such, the ALJ committed reversible error by granting portions of clinical records submitted from Pathways to Wellness and the Multilingual Counseling Center greater weight than certain medical opinions without explaining the reasons in the less-than-fully-favorable notice of decision.

### 3. Whether the ALJ's Residual Functional Capacity Determination Was Erroneous

Wilson argues that the ALJ's RFC determination was not supported by substantial evidence because (1) the ALJ accorded Dr. Nelson's opinion insufficient weight; (2) the ALJ accorded Dr. Franklin's opinion insufficient weight; (3) the ALJ erred in rejecting records from Pathways to Wellness and the Multilingual Counseling Center; and (4) the ALJ identified Wilson's panic disorder as a severe impairment but did not consider panic disorder when assessing Wilson's RFC.

The ALJ did not commit error by granting limited weight to Dr. Nelson's and Dr. Franklin's opinions, as discussed above. The weight the ALJ gave to the records from Pathways to Wellness and the Multilingual Counseling Center was insufficiently explained, as addressed above. On remand, the ALJ must assess the weight she assigns to those records. That assessment will impact the extent to which those records inform the ALJ's RFC determination on remand.

The Commissioner does not address Wilson's argument with respect to the ALJ's treatment of her panic disorder. Wilson is correct that the ALJ identified three severe

impairments: depressive disorder, anxiety disorder, and panic disorder. A.R. 22. Wilson is also correct that the ALJ did not use the words "panic disorder" in the paragraph concluding that a functional limitation preventing detailed instructions is appropriate. A.R. 27. However, it is clear that the ALJ considered the effects of Wilson's panic disorder throughout her description of the medical record supporting the assessed functional limitation. Moreover, shortly after concluding that Wilson's medically-determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ noted that "[t]he claimant alleged that she suffers from debilitating panic attacks and depression but the record reveals that the claimant improved with treatment and providers consistently noted normal mental status findings except for a depressed mood." Id. The court finds that the ALJ did not impermissibly exclude consideration of Wilson's severe impairment of panic disorder when assessing Wilson's RFC.

### 4. Whether the ALJ Erred When Determining Wilson Did Not Qualify as Disabled Under Listings 12.04 and 12.06

If a claimant establishes that her impairments meet or medically equal an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1, an ALJ will find that the impairments are severe enough to prevent the performance of any gainful activity. See 20 C.F.R. §§ 404.1525(a), 416,925(a), 404.1526 & 416.926.

The Commissioner argues that the ALJ found that Wilson did not meet either listing because she only had mild restrictions in activities of daily living; mild difficulties in social functioning; moderate difficulties in concentration, persistence and pace, and no episodes of decompensation.

As discussed above, on remand the ALJ must assess the weight assigned to records submitted from Pathways to Wellness and the Multilingual Counseling Center. Those records contain, for example, indications that Wilson is markedly limited by her ability to maintain concentration and by her episodes of decomposition lasting for extended periods. A.R. 707; see also A.R. 642. The ALJ's assessment of the weight she assigns to those records will impact the extent to which those records inform the ALJ's

determination of this issue on remand. Wilson articulates no other potential source of error with respect to this finding.

### 5. Whether the ALJ Erroneously Accorded Wilson's Testimony Improper Weight

The ALJ, like the reviewing court, faces limits when making credibility determinations. With regard to a claimant's testimony, the claimant must first present objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or symptoms alleged. Lengenfelter v. Astrue, 504 F.3d 1028, 1035–36 (9th Cir. 2007). After the claimant has done so, and if "there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." Id. (internal quotation marks omitted); see also Revels, 874 F.3d at 655; Robbins v. Social Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."); Morgan, 169 F.3d at 599 (the ALJ "must provide 'specific, cogent reasons for the disbelief'").

In making credibility determinations, the ALJ must specifically identify the testimony she finds not to be credible and must explain what evidence undermines the testimony. Holohan, 246 F.3d at 1208. When weighing the claimant's credibility, the ALJ may consider factors such as the "claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between her testimony and her conduct, claimant's daily activities, her work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains." Thomas v. Barnhart, 278 F.3d 947, 958–59 (9th Cir. 2002).

The ALJ found three of Wilson's statements not entirely consistent with the evidence in the record: (1) Wilson alleged debilitating panic attacks and depression; (2) Wilson alleged that she had trouble interacting with others; and (3) Wilson alleged that

she had side effects from her medication.  A.R. 27–28.

Generally, Wilson argues that her symptoms wax and wane, and it is improper to single out instances of temporary well-being or improvement and rely on those examples to find Wilson not credible.  See Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014) ("it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working").  But the ALJ did not cherry-pick periods of improvement from a course of directionless treatment to reach the conclusion that Wilson improved with treatment.  Rather, the record generally shows that Wilson's anxiety and depression improved with the use of Celexa.  In August 2009, Wilson reported that Celexa had "stopped her anxiety/panic attacks."  A.R. 377–78.  In April 2010, she reported that her anxiety was "controlled since she started celexa."  A.R. 373.  On October 10, 2012, after a "somewhat stressful period," Wilson reported worsening symptoms, including increased panic attacks.  A.R. 388.  Dr. Nelson increased her dose of citalopram in response.  A.R. 388–89.  Wilson discontinued Celexa in January 2013 after that increased dose caused adverse side effects, at which point Wilson's symptoms worsened.  See A.R. 387.  But after restarting the medication in September 2013 (A.R. 558), Wilson was "doing very well," with occasional anxiety attacks limited to car or bus trips.  A.R. 557.  In December 2014 and May 2015 Wilson reported feeling less anxious and "very well."  A.R. 567, 660.  In October 2015, Dr. Nelson described Wilson as "delightful" and her anxiety as "stable."  A.R. 671.  The record supports the ALJ's conclusion that Wilson's anxiety and panic attacks were effectively controlled with Celexa medication with substantial evidence.  The ALJ reasonably concluded that the record contradicted Wilson's allegations of debilitating mental symptoms.

First, with respect to the ALJ discounting Wilson's alleged debilitating panic attacks and depression, Wilson argues that considering her school attendance as part of her daily activities was inappropriate because further development of the record would have revealed that Wilson did not finish the classes.  As addressed above, the ALJ's

29

consideration of Wilson's school attendance was not erroneous.

Wilson also argues that normal mental status exams during Wilson's appointments are not informative of her condition while she was actually undergoing panic attacks. While it is certainly the case that Wilson's mental status exams would not provide direct evidence about her behavior during panic attacks if she was not suffering from an attack during the office visit, the mental status exams and clinical treatment record generally communicate useful information about the frequency of—and Wilson's condition between—such attacks. Cf. A.R. 557 ("she is feeling a little bit anxious now"). The ALJ's determination does not rest on a finding that Wilson is capable of specific functions during an acute panic attack; rather, the determination was that Wilson is capable of work with specified limitations in spite of severe limitations, including panic attacks.

Second, with respect to Wilson's testimony that she had trouble interacting with others, Wilson argues that she relies on her daughter for help with her activities of daily living, and otherwise she isolates herself in her home to control her symptoms. Contrary to the ALJ's finding, she argues that she does not spend time with family and friends. Wilson argues that the fact that she can take 30-minute walks with her daughter and attend medical appointments does not detract from her credibility that she suffers from frequent panic attacks, anxiety, and depression. That much is true, but the ALJ also considered the record evidence of Wilson's interactions with others to assess the credibility of Wilson's statements that she has trouble interacting with others. The record supports the ALJ's assessment that Wilson does not have trouble interacting with her daughter. E.g., A.R. 315, 317, 513–14, 628. Moreover, the record supports with substantial evidence that Wilson does not have trouble interacting with non-family members like medical providers. E.g., A.R. 515 (Wilson "was pleasant and cooperative"), 558 (Wilson is "delightful"), 567 ("generally normal", "average" eye contact, "cooperative" attitude), 645 (Wilson "has a good sense of humor, is well educated, intelligent and self-reflective"), 671 (Wilson is "delightful"), 707 (Wilson is a "thoughtful, loving mother" with "fair" eye contact who was "cooperative" and engaged"); cf. 720 (Wilson has gotten into

fights with her loud roommates).

Third, the parties do not address Wilson's testimony with respect to side effects from medication. The record is at least mixed on the question. <u>E.g.</u>, A.R. 387 (increased dosage of Celexa caused adverse side effects).

For the reasons stated above, the ALJ gave "specific, clear and convincing reasons" for rejecting Wilson's testimony. <u>See</u> <u>Lengenfelter</u>, 504 F.3d at 1036. The ALJ specifically identified the testimony she found not to be credible and explained the evidence that undermined the testimony. <u>See</u> <u>Holohan</u>, 246 F.3d at 1208. The ALJ properly considered inconsistencies between Wilson's testimony and her conduct, Wilson's daily activities, and testimony from physicians and third parties concerning the nature, severity, and effect of Wilson's symptoms. <u>Thomas</u>, 278 F.3d at 958–59.

### 6. Whether Remand Is the Proper Disposition

"Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." <u>Benecke v. Barnhart</u>, 379 F.3d 587, 593 (9th Cir. 2004) (citing <u>Harman v. Apfel</u>, 211 F.3d 1172, 1178 (9th Cir. 2000)). Under <u>Harman</u>, the court may credit evidence that was rejected by the ALJ and remand for an award of benefits "if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." <u>Benecke</u>, 379 F.3d at 593 (citing <u>Harman</u>, 211 F.3d at 1178).

With respect to the first <u>Harman</u> factor, the ALJ failed to provide reasons for weighing certain evidence from Pathways to Wellness and the Multilingual Counseling Center. Second, there are outstanding issues that must be resolved before a determination of disability can be made. Specifically, the ALJ must determine how to weigh the Pathways to Wellness and Multilingual Counseling Center records. Third, it is not clear from the record that the ALJ would be required to find the claimant disabled even if the evidence were credited. Even if the ALJ interprets the Pathways to Wellness

and Multilingual Counseling Center records as Wilson argues they should be interpreted (which is an open question), the ALJ would not be required to find Wilson disabled due to the other evidence in the record.

It is appropriate here to follow the "ordinary remand rule" and not apply the "rare" remedy of finding disability when the agency did not. See Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090 (9th Cir. 2014).

## CONCLUSION

For the foregoing reasons, Wilson's motion for summary judgment is GRANTED. The Commissioner's cross-motion for summary judgment is DENIED. The ALJ's decision to deny Wilson's disability benefits failed to adequately explain how she weighed the Pathways to Wellness and Multilingual Counseling Center records. Thus, remand is appropriate pursuant to 42 U.S.C. § 405(g). On remand, the ALJ should explain the weight she accords the Pathways to Wellness and Multilingual Counseling Center records, and her reasons for doing so. The ALJ's consideration of those records on remand may or may not impact her RFC determination and her determination about whether Wilson has established that her impairments meet or medically equal an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1. If the ALJ adequately explains her consideration of those records—and if as a result her prior conclusions remain substantially supported—she will resolve all of the issues identified on this appeal.

This order fully adjudicates the motions listed at Nos. 13 and 15 of the clerk's docket for this case, closes the case, and terminates all pending motions.

**IT IS SO ORDERED.**

Dated: December 6, 2018

_____
PHYLLIS J. HAMILTON
United States District Judge